**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CLARK JONES,<br>    *Plaintiff*,<br><br>    v.<br><br>ACUREN INSPECTION INC.,<br>    *Defendant*. | No. 3:23-cv-1054 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Clark Jones ("Plaintiff" or "Mr. Jones") has brought an action against his former employer for disability discrimination, in violation of the Palliative Use of Marijuana Act ("PUMA"), negligent infliction of emotional distress, and intentional infliction of emotional distress.

Defendant has moved to dismiss the claims for disability discrimination, intentional infliction of emotional distress, and negligent infliction of emotional distress.

For the following reasons, the motion to dismiss is **GRANTED in part and DENIED in part**.

Both the intentional infliction of emotional distress and the negligent infliction of emotional distress claims are dismissed. The disability discrimination claim under the Connecticut Fair Employment Practices Act ("CFEPA") will remain in the case, but only to the extent brought under Conn. Gen. Stat. §§ 46a-60(b)(1); any alleged CFEPA claim brought under Conn. Gen. Stat. §§ 46a–58(a) is dismissed.

1

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

In 1993, Connecticut Metallurgical, Inc. hired Mr. Jones as a laboratory technician at the East Harford laboratory location. Ex. A to Not. of Removal, ECF No. 1-1 ("Compl.)" ¶¶ 11–12. Mr. Jones allegedly performed his work at or above satisfactory levels. *Id.*

In 2001 and 2005, Mr. Jones had major back and spine surgeries and has since continued to suffer from back and spinal pain. *Id.* ¶ 13. Allegedly, Mr. Jones's "back and spinal pain became unbearable, [and] in an effort to alleviate the extreme pain, Plaintiff's doctor prescribed pain medication, as well as, cannabis (gummy) with melatonin and THC for his debilitating medical condition and to help with the pain he suffered while trying to sleep." *Id.* ¶ 15.

In 2019, Acuren Inspection ("Defendant" or "Acuren") acquired Connecticut Metallurgical, Inc. and allegedly implemented a drug screening test for new employees only. *Id.* ¶ 14.

In mid-2021, Acuren allegedly "held a meeting and announced that it was requiring all employees to undergo drug testing" and the testing was to be completed by the end of 2021. *Id.* ¶ 16. Immediately after this meeting, Mr. Jones allegedly notified human resources and his supervisor about his prescriptions for pain medication and his marijuana prescription certificate, and Acuren never requested a copy of the certificate. *Id.* ¶ 17.

Around December 2021, Mr. Jones allegedly submitted to a drug test, which he failed. *Id.* ¶ 20. On December 9, 2021, Regional Manager, Andrew Dirats, allegedly called the Mr. Jones into his office, told him that he had failed the drug test taken the week before due to his medical marijuana use, and discussed the company drug policy, which stated that a violation of policy

2

would be found if an individual failed the drug test without prescriptions for opioids and/or cannabis. *Id.* ¶ 20–21.

During this meeting, Mr. Jones allegedly told Mr. Dirats that "he never thought he was in violation of any company policy because he had a prescription for all of his pain medication for his daily pain including the cannabis and his management team had prior knowledge of his prescriptions and medical marijuana use." *Id.* ¶ 22. Mr. Dirats allegedly stated Mr. Jones was being placed on suspension, but he was going to explore what could be done for him and stated, "I'm supposed to fire you. However, because you have been a good employee for 26 years, if you go through the drug program, pass the drug test and agree to random drug tests in the future, you can return to work." *Id.* ¶ 23.

After this meeting with Mr. Dirats, Mr. Jones allegedly contacted Tonia Hill, an administrator, "seeking some guidance and his options concerning the positive test result from his medical marijuana use." *Id.* ¶ 24. Mr. Jones was allegedly directed to Wendy Kirby, Human Resources Representative, and on December 10, 2021, Mr. Jones contacted Ms. Kirby "seeking guidance on what steps he needed to take to return to work." *Id.* ¶¶ 24–25. Ms. Kirby allegedly told Mr. Jones to contact SAP,[1] which he did. *Id.* ¶¶ 25–26. Mr. Jones allegedly then received a phone call from DISA[2] requesting that he register with a nonrefundable deposit of $500.00, which he paid. *Id.* ¶¶ 27–28. He was also told that he would incur additional fees for classes that he would be required to take. *Id*. Mr. Jones was also allegedly told that a counselor would be

---

[1] The parties provide no definition for this acronym.
[2] The parties provide no definition for this acronym.

contacting him, and when he received a call from a counselor several days later, he was told that

he had to "complete an out-of-pocket" program and earn a certificate of completion in order to

report back to work. *Id.* ¶¶ 28–29.

Mr. Jones allegedly stopped using his prescription pain medication, including his medical

marijuana for five days, then on December 18, 2021, allegedly contacted Ms. Kirby and

explained to her what his body went through during those five days and how he was in

excruciating pain, could not function and could not sleep. *Id.* ¶¶ 30–31. He allegedly also

explained that, as a result of this experience, "it was unlikely that he could proceed with the

program for which he was required to complete in order to return to work and that he could not

provide a negative test result due to the necessity of his medical marijuana use." *Id.* ¶ 31. During

the conversation, Mr. Jones allegedly stated "that it seemed as if he was not being given any

options or accommodations such as not having to provide a negative test result in order to

continue his employment with Defendant Acuren." *Id.* ¶ 32. Ms. Kirby allegedly did not provide

any options or guidance to the plaintiff. *Id.*

In Mr. Jones's view, "Defendant Acuren unlawfully penalized and terminated the

Complainant due to his disability and medical marijuana use, which is necessitated by his back

and spinal debilitating condition."[3]

On December 23, 2021, Mr. Jones allegedly received a text message from Wendy Kirby,

stating that his benefits would end on December 31, 2021. *Id.* ¶ 24. Mr. Jones claims that his

_____

[3] Acuren states the following in a footnote in their motion to dismiss: "Although Acuren adopts for purposes of this Motion Plaintiff's allegation that Acuren 'terminated' his employment, it can be readily inferred from the text of the Complaint that Plaintiff was not in fact terminated, but instead resigned." Mem. of L. in Supp. of Def. Partial Mot. to Dismiss at 5, ECF No. 9-1.

employment with Acuren provided his sole source of income and health insurance, and that he has suffered and continues to suffer financially as a result of his termination. *Id.* ¶¶ 36–40.

Before bringing this action, Mr. Jones filed a charge with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission within 300 days of the unlawful employment practices alleged. *Id.* ¶ 41.

### B.  Procedural History

On June 30, 2023, Mr. Jones filed his Complaint in Connecticut Superior Court. *See* Compl.

On August 7, 2023, Defendant removed it to federal court. *See* Not. of Removal, ECF No. 1.

On August 14, 2023, Acuren moved to dismiss Counts I, III, and IV of the Complaint. *See* Def. Partial Mot. to Dismiss, ECF No. 9 ("Mot."); Mem. of L. in Supp. of Def. Partial Mot. to Dismiss ECF No. 9-1 ("Mem.").

On September 26, 2023, Mr. Jones filed his opposition to the partial motion to dismiss. *See* Pl. Mem. in Opp. to Def. Partial Mot. to Dismiss, ECF No. 12 ("Opp.").

## II.    STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession

6

or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III.    DISCUSSION

Acuren has moved to dismiss Counts I (disability discrimination), III (intentional infliction of emotional distress), and IV (negligent infliction of emotional distress). Mem. at 1.

Acuren argues that: (1) an allegation of discrimination on the basis of medical marijuana use does not suffice to state a claim under Connecticut law for discrimination based on Mr. Jones's underlying disability, and (2) Mr. Jones's emotional distress claims fail because he does not plead facts plausibly suggesting entitlement to such relief. *Id.*

The Court will address these claims in turn.

### A.  The CFEPA Disability Discrimination Claim

The Connecticut Fair Employment Practices Act ("CFEPA") states:

> It shall be a discriminatory practice in violation of this section:
>
> For an employer . . . to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against any individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability, physical disability, including, but not limited to, blindness, status as a veteran or status as a victim of domestic violence[.]

Conn. Gen. Stat. §§ 46a–60(b)(1).

"Discriminatory claims brought under CFEPA, Conn. Gen. Stat. §§ 46a–60 *et seq.* are construed similarly to ADA claims, with Connecticut courts reviewing federal precedent

concerning employment discrimination and retaliation for guidance in enforcing the CFEPA."

*Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 255 (D. Conn.

2013); *see also Levy v. Comm'n on Human Rights & Opportunities*, 671 A.2d 349, 355 (Conn.

1996) ("Although this case is based solely on Connecticut law, we review federal precedent

concerning employment discrimination for guidance in enforcing our own anti-discrimination

statutes."); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)

(reviewing federal precedent, including the burden-shifting framework, as a basis for analyzing

CFEPA cases); *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 344 (D. Conn.

2016) ("The CFEPA is generally 'coextensive' with federal anti-discrimination statutes"); *Gran*

*v. TD Bank, NA*, 204 F. Supp. 3d 446, 452 (D. Conn. 2016) ("Generally, the analysis of

discrimination claims under CFEPA is the same as under Title VII.").

Connecticut courts have construed CFEPA more broadly than the federal ADA statute.

*See Beason v. United Technologies*, 337 F.3d 271, 277–278 (2d Cir. 2003) ("Given that the

definition of disability used by the ADA essentially pre-dates the definition of physical disability

promulgated by the Connecticut General Assembly for the CFEPA, the General Assembly, had it

wished to do so, could have adopted the ADA definition. The fact that the General Assembly

chose not to adopt that language readily supports an inference that the Connecticut legislature

appreciated the scope of the ADA definition and intended the CFEPA definition to be different.

Moreover, the case law on point, although not extensive, uniformly confirms our belief that the

CFEPA's definition of physical disability is broader than the ADA's."); *Desrosiers v. Diageo N.*

*Am., Inc.*, 105 A.3d 103, 110 (2014) (discussing how the legislature chose not to define physical

disability because they "wanted to cover as many people as possible under the definition and

8

leave it open and broad"); *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 88 (D. Conn. 2006) ("[CFEPA's] definition is significantly broader than that of the ADA because it does not require that the chronic impairment substantially limit a major life activity.").

Connecticut General Statutes §§ 46a–51(15) defines "physically disabled" as "any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device."

CFEPA does not define the terms "chronic," "handicap," "infirmity" or "impairment" – *see* Conn. Gen. Stats. §§ 46a–51(15) – and "when left undefined by the legislature, the words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed." Conn. Gen. Stats. §§ 1–1(a); *Carothers v. Capozziello*, 574 A.2d 1268, 1291 (Conn. 1990) (internal quotation and alteration omitted). Courts have used Webster's Third New International Dictionary Unabridged (1966) to define "handicap," as "a disadvantage that makes achievement unusually difficult; especially: a physical disability that limits the capacity to work;" "infirm" as "not strong or sound physically;" and "impair" as "to make worse; diminish in quantity, value, excellence or strength." *Medvey v. Oxford Health Plans, Inc.*, No. 3:01-CV-1977 (EBB), 2005 WL 2300379, at *18 (D. Conn. Sept. 20, 2005); *see also Seely v. Winchester Electronics Corp.*, No. CV-11-6008102-S, 2013 WL 4504830, at *5 (Conn. Super. Ct. Aug. 2, 2013); *Fasulo v. HHC Physicianscare, Inc.*, No. HHDCV146054624S, 2016 WL 3266434, at *4 (Conn. Super. Ct. May 24, 2016).

To define "chronic," courts have used Black's Law Dictionary 241–42 (6th ed. 1990),

which defines "chronic" as "of long duration, or characterized by slowly progressive symptoms; deepseated and obstinate, or threatening a long continuance; distinguished from acute." *See Fasulo*, 2016 WL 3266434, at *4; *Gilman Bros. Co. v. Conn. Comm'n on Human Rights & Opportunities*, No. CV-950536075-S, 1997 WL 275578, at *4 (Conn. Super. Ct. May 13, 1997); *Hutchinson v. Ecolab, Inc*., No. 3:09CV1848 JBA, 2011 WL 4542957, at *9 (D. Conn. Sept. 28, 2011). Connecticut courts have also held "chronic" to similarly mean "marked by long duration or frequent recurrence or always present or encountered." *Fasulo*, 2016 WL 3266434, at *4 (collecting cases).

> There is a split of authority on whether the plaintiff's condition must be unresponsive to medical treatment and ameliorative measures for the condition to be "chronic." On the one hand, courts acknowledge that the condition must substantially limit a major life activity to be a disability under the ADA, and some courts require the condition to be unresponsive to medical treatment and ameliorative measures to be "chronic" under the Connecticut Fair Employment Practices Act.
>
> On the other hand, some courts recognize that "disability" is defined more broadly under the Connecticut Fair Employment Practices Act than the ADA, and one court rejects the requirement that the condition must be unresponsive to medical treatment and ameliorative measures to be "chronic" under the Connecticut Fair Employment Practices Act.

*Tryon v. EBM-Papst, Inc*., No. HHBCV176037028S, 2017 WL 6273698, at *5–6 (Conn. Super. Ct. Nov. 9, 2017*); Peck v. City of Waterbury Bd. of Educ*., No. UWYCV196044774S, 2020 WL 3485716, at *1–2 (Conn. Super. Ct. June 3, 2020) (internal citations and quotations omitted); *see also Dawson v. Sec. Servs. of Connecticut Inc*., No. 3:20-CV-01310 (SVN), 2022 WL 17477601, at *13 (D. Conn. Dec. 6, 2022). To be chronic, the condition does not need to be permanent. *See Caruso v. Siemens Bus. Systs., Inc*., 56 Fed. App'x 536, 537 (2d Cir. 2003) ("judges in the

District of Connecticut and Connecticut state courts previously have rejected the view that the ADA [permanence] standard is incorporated into CFEPA").

Acuren argues that Mr. Jones failed to allege that he actually notified them of his underlying condition. Mot. at 4. Acuren claims that Mr. Jones only told Acuren officials of his "prescription for pain medication" and "excruciating pain" and that "this alone is insufficient to put Acuren on notice of a qualifying disability under CFEPA." *Id.* Acuren further argues that Mr. Jones has failed to allege facts "showing that his disability motivated any adverse action." *Id.* at 5. Lastly, Acuren argues that refusing to allow an employer to consume medical marijuana cannot be the basis for a disability discrimination claim under CFEPA because it can only be brought under the Palliative Use of Marijuana Act, Conn. Gen. Stat. § 21a-408p ("PUMA") (Mr. Jones has brought such claims in Count II, but they are not addressed in this motion). *Id.* at 5–7.

In response, Mr. Jones argues that he made a number of allegations sufficient to put Acuren on notice.[4] Opp. Mem. at 6–8. Mr. Jones also argues that "Defendant was fully aware

---

[4] Mr. Jones made the following relevant allegations in his complaint:

> Immediately after the meeting, Plaintiff notified Wendy Kirby, HR Representative, and his Supervisor, John Abiadesign, of his prescriptions for pain medication including his marijuana prescription certificate.

> On December 9, 2021, Regional Manager, Andrew Dirats, called the plaintiff into his office and informed the plaintiff that he failed the drug test taken the week prior due to his medical marijuana use.

> During the meeting on December 9, 2021, Plaintiff and Andrew Dirats discussed the company drug policy that stated a violation of policy would be found if an individual failed the drug test without prescriptions for opioids and/or cannabis.

> Plaintiff stated to Andrew Dirats that he never thought he was in violation of any company policy because he had a prescription for all of his pain medication for his daily pain including the cannabis and his management team had prior knowledge of his prescriptions and medical marijuana use.

11

that the plaintiff suffered from a disability regarding his debilitating medical condition of back and spinal pain" and that his "disability motivated the Defendant to engage in adverse employment action against [him]" which included: termination; scheduling benefits to end on December 31, 2021; refusing to provide any options or accommodations for his disability; placing him on suspension on December 9, 2021; and forcing him to participate in the employer drug program, which Acuren knew he could not possibly complete successfully. *Id.* at 8–9.

The Court agrees, in part.

As a preliminary matter, the Court will review Plaintiff's claim under CFEPA and not under Conn. Gen. Stats. §§ 46a–58(a). *See Comm'n on Hum. Rts. & Opportunities v. Truelove &*

---

During the December 9, 2021 meeting, Andrew Dirats stated that Plaintiff was being placed on suspension, but he was going to explore what could be done for the plaintiff. Mr. Dirats stated, "I'm supposed to fire you. However, because you have been a good employee for 26 years, if you go through the drug program, pass the drug test and agree to random drug tests in the future, you can return to work."

Following the meeting with Andrew Dirats, the plaintiff contacted Tonia Hill, Administrator, regarding seeking some guidance and his options concerning the positive test result from his medical marijuana use. Instead, Ms. Hill directed the plaintiff to Wendy Kirby, HR Representative.

On December 18, 2021, Complainant contacted Wendy Kirby and explained to her what his body went through during the five days of not taking his prescription pain medication including medical marijuana and how he was in excruciating pain, could not function and could not sleep. He further explained that, as a result of such experience, it was unlikely that he could proceed with the program for which he was required to complete in order to return to work and that he could not provide a negative test result due to the necessity of his medical marijuana use.

Defendant Acuren was fully aware of Plaintiff's medical condition and disability.

Opp. Mem. at 6–8.

*Maclean, Inc.*, 680 A.2d 1261, 1267 (Conn. 1996) ("the specific, narrowly tailored cause of action embodied in §§ 46a–60 supersedes the general cause of action embodied in §§ 46a–58(a)"). Any CFEPA claim brought under §§ 46a–58(a) therefore must be dismissed.

As to the CFEPA claim brought under §§ 46a–60, disparate treatment claims, such as this one, are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a prima facie case of intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (internal quotation marks omitted).

Mr. Jones has alleged sufficient facts to establish a *prima facie* case, namely that (1) he is a member of a protected class because of his physical disability; (2) he was qualified for the position he held for 26 years with Acuren; (3) he lost his employment with Acuren; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *See Reynolds*, 685 F.3d at 202 (stating factors).

As to the argument that Mr. Jones failed to allege facts sufficient facts to put Acuren on notice about his disability, *see Longway v. Myers Industries, Inc.*, 812 Fed. Appx. 57, 59 (2d Cir. 2020) ("And to the extent that Longway communicated to his employer that he received medical treatment, the record does not show that he ever characterized his condition as anything other than a one-time injury of the sort that would not qualify as a disability under [the ADA or CFEPA]."), that fact-based inquiry is for the summary judgment stage, not now. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237–40 (2d Cir. 2007) (finding that the district court

13

erred in granting the motion to dismiss the employment discrimination claim because "[a]t this stage of litigation, plaintiffs need not plead a *prima facie* case and may withstand a motion to dismiss by meeting a lesser standard . . . the complaint contains other allegations that, when construed together to draw all reasonable inferences in favor of plaintiffs, state valid causes of action") (citations omitted); s*ee also Hagan v. City of New York*, 39 F. Supp. 3d 481, 513 (S.D.N.Y. 2014) ("Defendants are not entitled to dismissal of this portion of Hagan's claim at this early stage.").

As to the argument that Mr. Jones's CFEPA disability discrimination claim is foreclosed because he also has brought a claim under PUMA, that argment, too, is premature, at best. At this stage of the case, because Mr. Jones otherwise has sufficiently alleged a CFEPA disability discrimination claim, as noted above, there is no legal basis – nor any Connecticut Supreme Court or Connecticut Appellate Court authority – for dismissing it. *See, e.g.*, *Dreier v. Upjohn Co.*, 492 A.2d 164, 167 (Conn. 1985) ("Under our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability against one or more defendants in a single complaint."); *Vidiaki, LLC v. Just Breakfast & Things!!!*, 33 A.3d 848, 862 (Conn. App. 2012) (a plaintiff is "entitled to plead various alternatives in its complaint, even when those assertions are contradictory"); *Cunningham v. Cornell Univ.*, 86 F.4th 961, 979 (2d Cir. 2023) ("a plaintiff may plead multiple—sometimes contradictory—theories of liability.").

Even the relatively recent decision in *Bulerin v. City of Bridgeport*, No. FBTCV196083042S, 2019 WL 1766067, at *6 (Conn. Super. Ct. Mar. 8, 2019) does not rule out the possiblity that being physically disabled for CFEPA purposes could be consistent with a dehabilitating medical condition for PUMA purposes. *See id.* ("While the definition of being

14

'physically disabled' could overlap with having a 'debilitating medical condition' for PUMA, the discrimination that [PUMA] seeks to prevent is for the treatment of using marijuana, not the underlying medical condition."). Here, unlike in *Bulerin*, Mr. Jones appears to be seeking to prevent adverse treatment based on his condition, not based on his marijuana use. Opp. at 13 ("Plaintiff alleges a physical disability, namely, post-surgical back and spinal pain that impacted his functioning and sleep.").[5]

Accordingly, Acuren's motion to dismiss the disability discrimination claim under CFEPA, §§ 46a–60, will be denied, although any alleged claim under §§ 46a–58(a) will be dismissed.

### B. The Intentional Infliction of Emotional Distress Claim

An intentional infliction of emotional distress claim must contain the following four elements:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct;
>
> (2) that the conduct was extreme and outrageous;

---

[5] Similarly, Judge Stefan Underhill's recent decision in *Eccleston v. City of Waterbury*, No. 3:19-CV-1614 (SRU), 2021 WL 1090754, at *11 (D. Conn. Mar. 22, 2021), in which he "declined to exercise supplemental jurisdiction over the remaining state law claims" is inapposite because his focus was on differences between federal and state law, not the meaning and scope of two Connecticut statutes. *Id.* ("The current split between state and federal law with regard to the legality of medical marijuana has placed individuals like Eccleston, who rely on medical marijuana to treat various illnesses, in a difficult position. Although I am sympathetic to the challenges and complexities of navigating the tension between those two statutory schemes, especially in the context of a relationship with an employer, medical marijuana is illegal under federal law and federal law therefore does not provide protection against employer discrimination for the use of medical marijuana, even where that use is expressly linked to an underlying disability.").

(3) that the defendant's conduct was the cause of the plaintiff's distress; and

(4) that the emotional distress sustained by the plaintiff was severe.

*Appleton v. Bd. of Educ. of Town of Stonington*, 757 A.2d 1059, 1062 (Conn. 2000).

Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. *Bell v. Board of Education*, 739 A.2d 321, 327 (Conn. App. 1999). Only where reasonable minds disagree does it become an issue for the jury. *Id.* "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Tracy v. New Milford Pub. Sch.*, 922 A.2d 280, 287 (Conn. App. 2007); 1 Restatement (Second) Torts § 46, comment (d) (1965). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Mellaly v. Eastman Kodak Co.,* 597 A.2d 846, 847 (Conn. Super. Ct. 1991); *Little v. Yale Univ.*, 884 A.2d 427, 432 (Conn. App. 2005).

Here, Acuren argues that Connecticut courts have dismissed similar claims against employers at the pleadings stage, based on allegations of conduct far more severe than anything Mr. Jones has alleged in his Complaint. Mem. at 8. It claims that Mr. Jones "has failed to plead any allegations, that, if proven, would rise to the level of 'extreme and outrageous conduct'" and that "he claims only that Acuren enforced its company drug policy and required him to undertake a remediation program in order to return to work." *Id.* at 9.

Mr. Jones argues that Acuren's conduct in terminating his employment, and the circumstances surrounding that termination, constitute "extreme and outrageous conduct." Opp. at 11. Specifically, he argues that "despite 26 years of employment, Defendant being aware of Plaintiff's disability and his prescription for medical marijuana, and a provision in the Defendant's employee handbook finding a violation where opioids or cannabis are found in an employee's system 'without a prescription,'" Defendant discriminated against and ultimately terminated the Plaintiff based on his disability and his use of medical marijuana with a prescription for pain. *Id.* Mr. Jones alleges that, especially because such conduct was in direct contradiction of the Acuren's own employee handbook, these acts could be found to be "extreme and outrageous." *Id.*; Compl. ¶¶ 18, 22.

With respect to emotional distress, Mr. Jones argues that, based on the circumstances, Acuren knew or should have known that its conduct — notifying the Mr. Jones that he was supposed to be fired, requiring him to take and pass a drug test and future drug tests, and unreasonably exposing him to unnecessary excruciating pain by forcing him to stop using his medical marijuana prescription for five days, and indefinitely if he wanted to save his job — would cause Mr. Jones significant stress, anxiety, and emotional distress (which he then suffered). Opp. at 13.

Mr. Jones also argues that he had a "longstanding belief that his job was safe due to his having prescriptions yet was abruptly and discriminately terminated causing [him] significant stress and concerns with his future and ability to earn a living." *Id.* at 12–13.

The Court disagrees.

"Mere wrongful termination of employment, even accompanied by wrongful motivation,

fails to create a cause of action for negligent or intentional infliction of emotional distress. It is the untoward manner or process of termination rather than the fact of wrongful termination which constitutes negligent or intentional infliction of emotional distress in the employment context." *Simcic v. G & W Mgmt., Inc.*, No. CV0073700S, 2000 WL 1872002, at *4 (Conn. Super. Ct. Dec. 5, 2000) (citing *Parsons v. United Technologies Corp.*, 700 A.2d 655, 663 (Conn. 1997) and *Pavliscak v. Bridgeport Hospital*, 711 A.2d 747, 756 (Conn. App. 1998)). Furthermore, Connecticut courts have held that "vindictive conspiracy to terminate a plaintiff's employment, even if true, would not necessarily be sufficient to state a claim for intentional infliction of emotional distress." *Grasso v. Connecticut Hospice, Inc.*, 54 A.3d 221, 231 (Conn. App. 2012) (citing *Gillians v. Vivanco-Small*, 15 A.3d 1200, 1204 (Conn. App. 2011).

While Mr. Jones relies on *Storm v. ITW Insert Molded Products*, 400 F. Supp. 2d 443 (D. Conn. 2005), in which the court denied the defendant's motion to dismiss the terminated employee's intentional infliction of emotion distress claim, that case is inapposite. There, the court held that "even though simply terminating an employee while on medical leave or at the conclusion of it cannot alone state a cause of action for intentional infliction of emotional distress, drawing all reasonable inferences from plaintiff's allegations, defendant's conduct of knowingly exposing plaintiff to unreasonable and unnecessary risk of cardiac arrest, which exceeds bad manners or hurt feelings, could show sufficient egregiousness." *Id.* at 449.

Nothing alleged in Mr. Jones's Complaint plausibly alleges that the manner in which he was terminated – apart from the fact of his termination – created an "unreasonable and unnecessary risk" to his health. As a result, Acuren's conduct cannot plausibly be said to rise to the level of "so outrageous in character, and so extreme in degree" that it "exceeds all bounds

usually tolerated by decent society." *See Gaube v. Day Kimball Hosp*., No. 3:13-CV-01845 VAB, 2015 WL 1347000, at *11 (D. Conn. Mar. 24, 2015) ("[T]he bar for conduct that is found to be 'extreme and outrageous' is set very high. A plaintiff must show conduct that 'exceeds all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'") (citation omitted); *Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss").

Accordingly, Acuren's motion to dismiss the claim of intentional infliction of emotional distress will be granted.

### C.  The Negligent Infliction of Emotional Distress Claim

The elements of a negligent infliction of emotion distress are as follows: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co*., 815 A.2d 119, 127 (Conn. 2003). Extreme and outrageous conduct is not an element of the negligent infliction of emotional distress cause of action. *Davis v. Davis*, 962 A.2d 140, 147 (Conn. App. 2009). The elements do not require proof of any particular level of intent; in fact, "intent need not be proven at all to establish a claim of negligent infliction of emotional distress." *Geiger v. Carey*, 154 A.3d 1093, 1120 (Conn. App. 2017). This claim requires proof of breach of a legally recognized duty. *Poce v. O & G Indus., Inc*., 269 A.3d 899, 914 (Conn. App. 2022), *cert. denied*, 271 A.3d 663 (Conn. 2022).

Here, Acuren argues that Mr. Jones does not allege that any conduct during the termination process (or otherwise, for that matter) created a severe, foreseeable, and unreasonable risk of causing Plaintiff emotional distress. Mem. at 12. Acuren claims that although Mr. Jones may believe that Acuren's failure to accommodate his request was wrongful, he does not allege that any "conduct during the termination process was sufficiently wrongful that the 'defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm.'" *Id.*

Mr. Jones argues that "[a]fter 26 years of employment, the defendant's knowledge of the plaintiff's disability and medical marijuana use, and the fact that the employee handbook stated that a violation would only be found if an employee failed a drug test without a prescription for its use, Defendant knew, or should have known, that Defendant's conduct including, but not limited to, the suspension on December 9, 2021 and ultimate termination of the plaintiff's employment and benefits posed an unreasonable risk of causing emotional distress to the plaintiff and such distress was foreseeable." Opp. at 13 (citing Compl. ¶¶ 18, 21–24, 32–34, 45–47). He claims that Acuren knew that he was dealing with a disability and he had excruciating pain that intensified when he tried to meet its demands and requirements. Opp. at 13.

The Court disagrees.

As noted above, just as with an intentional infliction of emotional distress claim, a negligent infliction of emotional distress claim in the workplace must arise from the allegedly "untoward manner or process of termination rather than the fact of wrongful termination . . . ." *Simcic v. G & W Mgmt., Inc.*, No. CV0073700S, 2000 WL 1872002, at *4 (Conn. Super. Ct.

20

Dec. 5, 2000) (citations omitted). Indeed, "no action may lie for negligent infliction of emotional distress which occurs during the employment relationship." *Perodeau v. City of Hartford,* 792 A.2d 752 (Conn. 2002). And "[a]n action for negligent infliction of emotional distress in the employment context may arise only out of the termination process." *Wilcox v. Yale Univ.,* No. CV020174796S, 2005 WL 2277261, at *1 (Conn. Super. Ct. Aug. 24, 2005).

Even in the context of the manner of termination, there must be "evidence that the manner of the plaintiff's termination from employment was different . . . from the usual termination of employment or that it was done in [a] way that would cause . . . more than the normal upset that would result from any termination of employment." *Chieffalo v. Norden Systems, Inc.*, 714 A.2d 1261, 1265 (Conn. App. 1998) (internal quotation marks omitted). Other than alleging the normal consequences that flow from any termination, *i.e.*, disappointment that it happened and why it happened, Mr. Jones fails to allege anything about how his termination occurred that would suggest a viable cause of action for negligent infliction of emotional distress in the employment context. *See, e.g.*, *Sempey v. Stamford Hosp.*, 221 A.3d 839, 848 (Conn. App. 2019) (upholding the dismissal of a claim for negligent infliction of emotional distress where employer allegedly "withheld three personnel folders that contained various certificates and personal records when it discharged her," because there were "no allegations that the documents in these folders were irreplaceable or of such value that it was patently unreasonable for the defendant to withhold them.") *Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss").

Accordingly, Acuren's motion to dismiss the claim of negligent infliction of emotional distress will be granted.

21

**IV.      CONCLUSION**

For the foregoing reasons, Acuren's motion to dismiss is **GRANTED in part and DENIED in part.**

Both the intentional infliction of emotional distress and the negligent infliction of emotional distress claims are dismissed. The disability discrimination claim under the Connecticut Fair Employment Practices Act ("CFEPA") will remain in the case, but only to the extent brought under Conn. Gen. Stat. §§ 46a-60(b)(1); any alleged CFEPA claim brought under Conn. Gen. Stat. §§ 46a–58(a) is dismissed.


**SO ORDERED** at New Haven, Connecticut, this 15th day of March, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE